IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |
|---|---|
| UNITED SOURCE ONE, INC. | * |
| Plaintiff | * |
| v. | Civil Case No. JKB-22-2309 |
| DOMINIC FRANK | * |
| Defendant | * |

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM**

Before the Court is Plaintiff United Source One, Inc.'s ("US1") Motion for Default Judgment against Defendant Dominic Frank. (ECF Nos. 13, 14.) Defendant has failed to file a response or to otherwise defend this action. No hearing is necessary to resolve the Motion. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons set forth below, US1's Motion will be denied.

*I.    Factual Background[1] and Procedural History*

US1 is a Maryland corporation that supplies, distributes, imports, and exports Halal-certified beef, lamb, poultry, and other food products. (Compl., ECF No. 1, ¶¶ 2, 16.) US1 supplies Halal foods to international markets, including the Middle East, where the foods are served in restaurants and hotels. (*Id.* ¶ 16.) Defendant is a Maryland citizen who began working as a purchaser for US1 on November 13, 2019. (*Id.* ¶¶ 5, 11.) Defendant's position required him to have access to certain confidential and proprietary information belonging to US1. (*Id.* ¶¶ 6, 25.)

---

[1] Defendant, "by his default, admits the plaintiff's well-pleaded allegations of fact[.]" *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (quoting *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). Accordingly, at this stage of litigation, the Court accepts as true the well-pleaded facts alleged in US1's Complaint.

As such, Defendant entered a "Non-Disclosure and Non-Compete Agreement" ("NDA") with US1 that, among other things, obligated him to safeguard the confidentiality of US1's confidential information and refrain from disclosing the information without prior written consent. (*Id.* ¶ 29; *see also* Agreement, Ex. A to Compl., ECF No 1-1.)

US1 contends that no global standard exists for the certification of Halal products. (Compl. ¶ 17.) As such, it relies upon "governmental import and food inspection regulations," "religious authorities," and the "demands of the consumer markets themselves" in attaining "acceptance" for its Halal products in international markets. (*Id.*) US1's strategy to compete in the "international Halal food industry" involves compiling, maintaining, and updating internal documentation regarding its business operations. (*Id.* ¶ 4.)

To aid in this strategy, US1 maintains four physical documents (the "Trade Secret Documents") at its Maryland headquarters, which are accessible only to its senior management, its market-facing employees, and its documentation department. (*Id.* ¶ 38.) The first document, "Trade Secret Document A," contains a "confidential compilation report information regarding of US based processors [sic]." (*Id.* ¶ 19.) "Trade Secret Document B" is a "similar compilation" that contains "extensive annotation by US1 employees reflecting specific transactions and individual processor permissions[.]" (*Id.* ¶ 20.) "Trade Secret Document C" and "Trade Secret Document D" concern the import requirements of two Middle Eastern countries and contain "non-public lists of US-based vendors whose Halal beef products meet each country's respective regulatory requirements[.]" (*Id.* ¶ 22.) US1 protects the secrecy of the documents by maintaining them only in hard copy, by employing an information technology services provider to monitor for their potential theft, and by limiting their exposure to a "need-to-know basis." (*Id.* ¶ 23.) US1 provided Defendant with access to each of the documents during his employment with US1. (*Id.*)

At some point while Defendant was still a US1 employee, he "photocopied, photographed, or scanned" Trade Secret Documents A, B, C, and D in order to convert them into an electronic format. (*Id.* ¶ 39.) In March 2022, Defendant was offered and accepted employment as a sales representative with Weinstein Wholesale Meats, Inc. ("Weinstein"), a beef distributor with whom US1 competes. (*Id.* ¶¶ 12, 34; *see also* Weinstein Agreement, Ex. B to Compl., ECF No. 1-2.) Defendant's employment with Weinstein was conditioned upon his agreement to refrain from "disclos[ing] any proprietary information or trade secrets from previous employers[.]" (Weinstein Agreement at 3.) Defendant emailed Trade Secret Documents A, B, C, and D from his US1 email account to his personal email account on April 5, 2022, and then resigned from US1 on April 14, 2022. (Compl. ¶¶ 31, 40.)

Unaware that Defendant had accepted employment elsewhere, US1 wrote to Defendant on April 14, 2022, to memorialize his departure from the company and confirm that he was aware of his obligations under the NDA. (*Id.* ¶ 32.) Subsequently, US1 and its information technology providers discovered that Defendant "deleted and concealed" emails containing Trade Secret Documents A, B, C, and D after his employment with US1 ended. (*Id.* ¶ 42.) Counsel for US1 sent a demand letter to Defendant on July 6, 2022, which outlined his allegedly unlawful acts and demanded the return of US1's confidential information. (*Id.* ¶ 44; *see also* Demand Letter, Ex. C to Compl., ECF No. 1-3.) Defendant did not respond to US1's letter. (Compl. ¶ 45.) On July 8, 2022, Weinstein (to which US1 had not sent a copy of its letter) sent correspondence to US1 in which it denied the allegations outlined in US1's July 6, 2022 letter to Defendant. (*Id.* ¶ 47.)

On September 12, 2022, US1 commenced this action. (*See generally id.*) US1 asserts claims for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*, and the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code Ann.

Com. Law. § 11-1201 *et seq.*, as well as for breach of contract with respect to the NDA. (*Id.* ¶¶ 49–83.) After Defendant failed to answer or otherwise defend this action, US1 moved for entry of default, (ECF No. 9), which the Clerk entered on October 31, 2022. (ECF No. 10.)

US1 filed the instant Motion for Default Judgment on January 4, 2023. (ECF No. 13.) US1 argues that default judgment on its misappropriation claims is warranted[2] because: (1) the Complaint establishes that US1 took reasonable security measures to protect its trade secrets; (2) the Complaint establishes the value derived from US1's trade secrets; and (3) the Complaint establishes that Defendant misappropriated US1's trade secrets. (Mem. Supp. Mot. Default J., ECF No. 14, at 3–6.) US1 additionally seeks a permanent injunction which would, among other things, order Defendant to identify and turn over any property containing US1's trade secrets. (*Id.* at 7–8.) Lastly, US1 seeks attorneys' fees pursuant to the DTSA and the MUTSA. (*Id.* at 8.)

## II. Legal Standard

After entry of default under Rule 55(a), a party may move for default judgment. Fed. R. Civ. P. 55(b)(2). Entry of default against a defendant does not alone entitle a plaintiff to judgment as of right:

> The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact . . . [but] is not held . . . to admit conclusions of law. In short, . . . a default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover. The court must, therefore, determine whether the well-pleaded allegations in [the] complaint support the relief sought in [the] action.

*Ryan*, 253 F.3d at 780 (citations omitted). "In the Fourth Circuit, district courts analyzing default judgments have applied the standards articulated by the United States Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), to determine whether allegations within the complaint are 'well-pleaded.'" *Vasquez-Padilla v.*

---

[2] US1 does not address its breach of contract claim in its Motion. (*See generally* Mem. Supp. Mot. Default J., ECF No. 14.)

4

*Medco Props., LLC*, Civ. No. PX-16-3740, 2017 WL 4747063, at *2 (D. Md. Oct. 20, 2017) (collecting cases). As such, "[w]here a complaint offers only 'labels and conclusions' or 'naked assertion[s] devoid of further factual enhancement,' the allegations therein are not well-pleaded and, consistent with the Court's discretion to grant default judgment, relief should be denied." *Id.*

Default judgment is appropriate when "the adversary process has been halted because of an essentially unresponsive party." *S.E.C. v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005) (citations omitted). However, "[a] defendant's default does not automatically entitle the plaintiff to entry of a default judgment; rather, that decision is left to the discretion of the court." *CapitalSource Fin., LLC v. Delco Oil, Inc.*, Civ. No. DKC-06-2706, 2010 WL 3733934, at *2 (D. Md. Sept. 20, 2010) (citation omitted). Indeed, "[u]nder modern procedure, defaults are not favored by the law and any doubts usually will be resolved in favor of the defaulting party." 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2681 (4th ed. 2022).

### *III. Analysis*

The Court begins its analysis by considering whether US1's DTSA and MUTSA misappropriation claims are sufficiently well-pleaded to warrant default judgment under Rule 55(b). *See Vasquez-Padilla*, 2017 WL 4747063, at *2. The DTSA permits "[a]n owner of a trade secret that is misappropriated [to] bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The DTSA defines "trade secrets" as

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
>
> (A) the owner thereof has taken reasonable measures to keep such information

5

secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). To prevail on a misappropriation claim under the DTSA, a party must allege that: (1) it owns a trade secret which was subject to reasonable measures of secrecy; (2) the trade secret was misappropriated by improper means; and (3) the trade secret implicates interstate or foreign commerce. *See Philips N. Am. LLC v. Hayes*, Civ. No. ELH-20-1409, 2020 WL 5407796, at *7 (citing 18 U.S.C. § 1836(b)(1)).

The MUTSA, Maryland's state-law analogue to the DTSA, provides a cause of action for the misappropriation of trade secrets which is "substantively the same" as a misappropriation claim under the DTSA. *Id.* The MUTSA defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process," that: (1) "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use;" and (2) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Md. Code Ann., Com. Law § 11-1201(e). To prevail on a misappropriation claim under the MUTSA, a party must establish that "(1) it possessed a valid trade secret, (2) the defendant acquired its trade secret, and (3) the defendant knew or should have known that the trade secret was acquired by improper means." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 660 (4th Cir. 1993) (citations omitted).

For the reasons below, US1 cannot prevail on its DTSA or MUTSA claims because it fails to plausibly allege that the documents identified in the Complaint were trade secrets under either

statute. As such, the Court must deny US1's Motion for Default Judgment. *See Vasquez-Padilla*, 2017 WL 4747063, at *2.

### *A.    Trade Secret Documents A and B*

As an initial matter, US1 does not plausibly allege that Trade Secret Documents A and B are "trade secrets" under the DTSA or the MUTSA. US1 describes Trade Secret Document A as "a confidential compilation report information regarding of [sic] US based processors." (Compl. ¶ 19.) US1 alleges that "[t]ogether with written US1's [sic] confidential annotations, this information identified processors that are confirmed to be capable of supplying Halal products for which US1 can obtain certifications regarding the products' Halal status." (*Id.*) US1 alleges that Trade Secret Document B is a "similar compilation that bore extensive annotation by US1 employees reflecting specific transactions and individual processor permissions." (*Id.* ¶ 20.) US1 alleges that Trade Secret Documents A and B are marked "Confidential," are not publicly available, and consist "entirely of information US1 obtained from non-public sources together with US1's real-time annotations." (*Id.* ¶ 21.)

Although Trade Secret Document A's contents allegedly stem from "non-public" sources, US1 fails to plausibly allege—as it must under the DTSA and the MUTSA—that the document contains information that is not "readily ascertainable" through proper means. *See* 18 U.S.C. § 1839(3)(B) (requiring that a trade secret "deriv[e] independent economic value . . . from not being generally known to, and *not being readily ascertainable through proper means* by, another person who can obtain economic value from" the information) (emphasis added); Md. Code Ann., Com. Law § 11-1201 (same).[3] Both documents allegedly contain a list of "processors" who are

---

[3] US1 asserts, without elaborating further, that its alleged trade secrets are "not readily ascertainable through proper means[.]" (Compl. ¶¶ 53, 68.) But this "naked" assertion does not entitle US1 to relief. *See Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'") (quoting *Twombly*, 550 U.S. at 555).

7

"confirmed to be capable" of supplying certain products. (Compl. ¶ 19.) But the Complaint does not clarify whether US1 confirmed this information through a proprietary relationship with the processors or simply used the same research methods available to other entities, such as competitors, who can obtain economic value from such information. For that matter, the Complaint does not clarify whether some, all, or none of the processors have a business relationship with US1. Given these ambiguities, the Court is unable to determine whether US1 *alone* was capable of confirming the processors' capabilities, or if the information is verifiable through normal due diligence. As such, US1 does not plausibly allege that this information is not "readily ascertainable" by others.

As support for its Motion, US1 cites case law recognizing that information may qualify as a trade secret despite "contain[ing] some public information and facts ascertainable from the marketplace . . . ." (Mem. Supp. Mot. Default J. at 5 (quoting *Motor City Bagels v. Am. Bagel Co.*, 50 F. Supp. 2d. 460, 479 (D. Md. 1999)). To be sure, courts have recognized that if aspects of a party's confidential information are readily ascertainable, the information may still qualify as a trade secret if the party "has invested time and resources into the development of the . . . information." *Philips*, 2020 WL 5407796, at *9 (citing *Ameritox, Ltd. v. Savelich*, 92 F. Supp. 3d 389, 402 (D. Md. 2015)); *see also Motor City Bagels*, 50 F. Supp. 2d at 479 ("A compilation of public information is protected if that information is, as a result of a business' efforts, combined in a unique way.") (quoting *Picker Int'l Corp. v. Imaging Equip. Servs., Inc.*, 931 F. Supp. 18, 38 (D. Mass. 1995)).

Nonetheless, the effort necessary to transform ascertainable information into a trade secret is generally substantial. For instance, in *Airfacts, Inc. v. Amezaga*, the Fourth Circuit held that a party's flowcharts displaying publicly available price data were trade secrets because the party's

8

"painstaking, expert arrangement" of the information into "particular groupings" made the flowcharts "inherently valuable separately and apart from the publicly available contents." 909 F.3d 84, 96 (4th Cir. 2018). This Court has likewise required that parties expend considerable effort to transform ascertainable information into a trade secret. *See, e.g., Motor City Bagels*, 50 F. Supp. 2d at 479 (holding that company's business plan was a trade secret despite containing readily ascertainable facts because it also included "personal insights and analysis brought to bear through diligent research and by marshaling a large volume of information").

But, unlike the trade secret owners in *Airfacts* and *Motor City Bagels*, US1 fails to allege that Trade Secret Documents A and B are the products of substantial time or resources. Indeed, a thorough review of the Complaint shows that US1 fails to explain the process, labor, or resources involved in creating these documents. (*See generally* Compl.) US1 cryptically alleges that both documents contain "annotations." (*Id.* ¶¶ 19, 20.) But it provides no detail on the nature or significance of the annotations. As such, the Court cannot determine how US1's efforts may have transformed what appear to be readily ascertainable facts into protected trade secrets. Lastly, US1's allegation that Trade Secret Document B contains "specific transactions and individual processor permissions" is unavailing. (*Id.* ¶ 20.) US1 fails to identify *whose* transactions it references or to explain the significance of "processor permissions." As such, the Court cannot determine whether the transactions or permissions are not generally known or readily ascertainable.

In sum, US1's allegations concerning Trade Secret Documents A and B are not sufficiently well-pleaded to allow the Court to determine whether either document is a "trade secret" pursuant to the DTSA or the MUTSA. US1 therefore cannot prevail on its DTSA or MUTSA claims with respect to these documents.

### B. *Trade Secret Documents C and D*

US1's claims regarding the other documents in this case fare no better. The Complaint provides a one-sentence description of Trade Secret Document C which alleges that the document "deal[s] with import requirements of two specific countries in the Middle East/North Africa region and contain[s] non-public lists of US-based vendors whose Halal beef products meet each country's respective regulatory requirements[.]" (*Id.* ¶ 22.) US1 describes Trade Secret Document D as containing the same information as Trade Secret Document C, and as "also identif[ying] specific US-based religious organizations, and points of contact at the same, whose certifications were and are accepted by that country's authorities." (*Id.*) Unlike Trade Secret Documents A and B, Trade Secret Documents C and D are not alleged to contain US1's annotations. (*Id.*)

As with Trade Secret Documents A and B, US1 fails to plausibly allege that the information contained in Trade Secret Documents C and D is not "readily ascertainable" under the DTSA or the MUTSA. Specifically, US1 fails to explain how a foreign nation's import or regulatory requirements cannot be accessed through conventional research. The Complaint also sheds no light on whether US1 has a proprietary or exclusive relationship with the "US-based vendors" or "religious organizations" it references, which leaves the Court unable to determine whether the identities of the vendors, religious organizations, products, or certifications are ascertainable. Lastly, the Court observes that, as discussed above regarding Trade Secret Documents A and B, the Complaint offers no detail on the time, resources, or processes utilized to create Trade Secret Documents C or D. (*See generally id.*)

For these reasons, US1 fails to plausibly allege that Trade Secret Documents C and D are "trade secrets" pursuant to the DTSA or the MUTSA. Because US1's other alleged trade secrets are also not cognizable under these statutes (as discussed above), US1 cannot prevail on its

10

misappropriation claims. As such, default judgment on these claims is not warranted.[4] *See Vasquez-Padilla*, 2017 WL 4747063, at *2.

Having disposed of the federal claims in this action, the Court also declines to exercise supplemental jurisdiction over US1's sole remaining claim for breach of contract. *See* 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction when all claims over which court had original jurisdiction have been dismissed). Because US1 cannot prevail on its misappropriation claims, and because the Court declines to exercise jurisdiction over US1's sole remaining claim, the Court will also dismiss this case on its own motion. *See United Auto Workers, Local # 5285 v. Gaston Festivals, Inc.*, 43 F.3d 902, 905–06, 911 (4th Cir. 1995) (affirming district court's *sua sponte* dismissal for failure to state a claim).

## V. Conclusion

For the reasons stated above, a separate Order shall issue denying US1's Motion for Default Judgment (ECF No. 13) and dismissing the case.

DATED this **31** day of March, 2023.

BY THE COURT:

James K. Bredar
Chief Judge

---

[4] US1's proposed injunctive relief and request for attorneys' fees are predicated solely upon its DTSA and MUTSA claims (Mem. Supp. Mot. Default J. at 7–8), neither of which are viable for the reasons discussed above. As such, the Court does not reach these issues.